Good morning. Mr. Betterman? It is. My name is Patrick Betterman and I have the privilege today to represent the appellants Hastings Acquisition, LLC, whom I'll refer to as Hastings, and an individual named Aron Puretz, whom I will refer to as Aron. Hastings is an Illinois limited liability company and Aron is a citizen of the state of New York. Hastings and Aron appeal the $880,000 award that the trial court made of the distributional interest of Lincoln Provisions, Inc., the appellee whom I'll refer to as Lincoln, in Hastings. Appellee Lincoln Provisions is an Illinois corporation headquartered in Chicago. It's controlled by the Stevens family and who is headed up by James Stevens. According to Exhibit 3 in the record, on March 4, 2010, Lincoln Provisions and Aron formed Hastings. They did that by filing articles of organization in the Secretary of State's Office of the State of Illinois in accordance with the requirements of Chapter 805, Act 180, the so-called, of the Smith-Heard, Illinois compiled statutes, the so-called Illinois Limited Liability Company Act. And I would say a preface that the Illinois Limited Liability Company Act, historically, had a profound influence on the Uniform Acts that were later adopted in, I believe, 96 and 2006. In any event, the Illinois Act had a rather unique provision which allowed a dissociating member to obtain fair value of his interest upon demand. That is, if he dissociated and it was allowed by the operating agreement, he had the right under Illinois law, in effect, to put his interest to the company, which made limited liability companies very fragile under Illinois law. In any event, this company was formed by the filing, and in the filing it was stated that the entity would be member-managed. That's important because a member-managed company is defined in the statutory provisions of the Illinois Act as being an entity that has stated in its articles that it's member-managed. And so it was that the trial court here concluded that it was member-managed, even though the parties practically believed that it was to be manager-managed by Lincoln, as I'll mention in just a moment. The trial court found that the filing of the articles that named the two members but didn't specify a percentage, just said this is going to be member-managed by these two entities, the trial court found that as a result of that filing, each of the members had a 50% interest in the entity. That is, each held 50% of Hastings, said the trial court. The trial court then concluded that there was no written operating agreement, nor did the parties reach any meeting of the minds about any matter of fact or thing about how they were going to run . . . Let me ask this. I don't remember at this point, but does Judge Gossett talk about how he arrived at the 50-50 split? Is there anything in the record that he relied on to get that, or just the fact that they said there were two members? What you just said, there is no reference at all in any finding of fact that Judge Gossett, the magistrate judge who handled this by consent, there was no finding of fact that he made that the parties had an agreement, that they reached an agreement that they were each to hold 50% of something, which we'll talk about in just a second. That finding was said in paragraph 5 of his findings, and in that citation where he said that each owned 50% of the company, he referenced exhibit 3, which is the articles. This is a very odd situation where you have a company formed under Illinois law, which it no doubt was. The statutes make clear that as soon as you file the articles of organization, 5-40 I believe, 5-5, the commencement of the entity exists. But what do you do when you've got an limited liability company that has no operating agreement? Judge Gossett, apparently, without saying it, concluded, I believe, that in order to have an operating agreement, it has to be in writing. You will note the sparsity. There is no authority under Illinois law whether an operating agreement has to be in writing or not. The best read of the statute is that an oral writing suffices for the reasons cited in footnote 11 of my brief. I'd also call the court's attention to 35-50, which also speaks in terms of a written agreement being necessary to establish the event after which a manager-managed member can dissociate. If it had to be in writing, why would they have had to mention a writing there? The point I get to when you look at what occurred here is the trial court made no finding as to any subsidiary finding of how this got to be 50-50. The 50-50 in this case is important to put in context. If you're talking about profits, are you talking about the final distribution of the equity? Are you talking about management? It's absolutely clear under the Act, under 15-3, members have equal management in the absence of a contrary provision in the operating agreement. So that without more, without an operating agreement, these members had equal management. However, when it comes to measuring an interest in a distributional interest for purposes of disassociation, we have to look at what rights does that person have in the distributional interest? What inures in that? Now, if we have a well-drawn operating agreement, it says, well, you get these distributions in this way and all that. Typically what happens is in accordance with the Internal Revenue Code, Section 1.704 of the regs, that you have a provision that you adopt capital accounts and you distribute in accordance with liquidation of the capital accounts, which means you get your return of capital back under standard accounting, and then your share of the profits. However, here we have none of that. So what do we do? Well, 15-5A makes it clear under the Act, and that is that you look to the default provision of the Act. Well, what default provision defines the distributional interest that Lincoln provisions have? And the answer is clear. It's 35-10B. There it is stated. As Justice Layman suggested in Wyoming law without the statute behind him, one should construe that statute to mean that you look at the hypothetical amount that the member would get if there were a liquidation as of the applicable valuation date. That's the date you look at. You look at the hypothetical amount that that person would get if there were a liquidation. Now, first you would say, well, let's go to the operating agreement and see what you get in that event. Well, we have none here. So it is, then we have to look to the statute. And the statute is clear. The first thing you do is take a return of the capital and then the balance of the assets after all capital is returned to the individuals is then allocated in equal shares to the partners in the absence of a different provision. When you think about what I just said, the $880,000 award here is astounding. It's astounding for this reason. Lincoln Provisions, Inc. had $100,000 in its contribution of capital, said the trial court. At the time that the disassociation was determined, according to the trial court July 2nd, which we think is clearly wrong, it should have been June 6th. I'm not going to belabor that right now. This is too important on these points. But the point of the matter is on that date, the judge said, and we agree with his value of 3.9, but we disagree that he didn't reduce it for the obvious amount he should have under 15-7B for the amount that Aaron had contributed in excess of his share of $1,070,000. But the $3.9 million in total assets that were in the company, $3.8 million of that was contributed by Puritz and $100,000 of that was contributed by Lincoln. The trial court awarded Lincoln $780,000. It put down $100,000 on or about March of 2010, and four months later it had a recovery of $780,000. That's a 780% profit, cash on cash. And it came out of, you would ask, well, where did the money come from? Well, if the total value of the enterprise was 3.9 and my clients put in 3.8, it's pretty clear that the 780 came from two sources. Number one, the $1,070,000 contribution that my client made to make up the shortfall that Lincoln didn't make and come into the table. Lincoln was supposed to put up 30% of the cash and didn't. So $1,070,000 of that 3.9 was my guy putting up a capital contribution in excess of his agreed contribution. Under 15-7B of the Act, that's a debt that should have been reduced to that 3.9. So where did the rest of the money come from? The rest of the money came from Aaron's capital contribution. $535,000 came from that $1,070,000 that should have been reduced of that 780 in excess of the $100,000 that Lincoln had in it, and the other $245,000 came right out of our capital contribution. After the smoke cleared, 3.9 minus 780 left the company with about $3,020,000, and our people put in $3,800,000. That doesn't seem fair. It's wrong. It's completely wrong because it fails to take into account the distribution that Lincoln would have had under the statute 39-10B. I would also note that even in the absence of the statute, there was a specific agreement on this that capital was to go back 70-30. There is enormous amount of evidence, the two operating agreements so provided. The e-mails from Dahman in his July 2nd letter, which I didn't mention, also states that the only amount that they were looking for in equity was half of what was left over after capital contributions were returned, which is exactly what the trial court didn't do. This is a bizarre result. It is an inequitable result. It's just plain, flat wrong. The judge did not take into account the guiding principles of the statute to measure the interest, and in so doing, affected a terribly inequitable result. Who would ever agree to put in capital, 70% of the capital, and then only get 50% back? Only a moron would do that, and yet that's what the trial court, in effect, I'm not suggesting Judge Gossett's a moron. I'm just suggesting that that's the effect of what had occurred here. It's wrong. It's unfair. It's not right, and I would reserve the balance for my rebuttal. Thank you. Good morning, Mr. Yardley. Good morning. May it please the court. First off, counsel is trying to get the court to buy into that the proper analysis here is evaluation of what occurred on a dissolution basis, and that's the Illinois Limited Liability Company Act 35-10. That's the statute, the portion of the act to which they're arguing, and in fact, it is a disassociation, and under the disassociation standard 35-65, the court applied that correctly, and the court's findings are sound and based on substantial evidence. How did Judge Gossett get to the 50-50? Well . . . What findings did he make other than that conclusion that the record supports that he made a finding on the record supports that it would be 50-50 in a disassociation? The facts and the way this partnership, this entity, came together was that the Pruitts family was essentially the money behind it, and the record's clear that they . . . I understand. Your clients were supposed to put up to management, but they didn't manage. Well . . . I think we're getting it as . . . If they'd run the company for a while, the LLC for a while, that'd be one thing, but what did Judge Gossett rely on to say it was 50-50 in the disassociation? Well, my understanding is significant testimony and evidence that our clients found the opportunity. They had the know-how. They invested the time, the expertise, and the skills to develop the business plan. The business plan was extensive. He made those findings? That was evidence before the court. I'm not necessarily saying it's found in his order. Okay. Let's stick first with what factual findings did he make to say that this record supports a 50-50 split, and then we can go to what it is in the record that . . . Well, my recollection, Your Honor, is that he evaluated the testimony that our clients were the ones that put together the opportunity, put together the business plan. You're back to the record again. Yeah. I'm like, what did he say? It's been a while since I looked at it, but I don't remember him, Judge Gossett, explaining, making findings about how he got to the 50-50. Correct me if I'm wrong. You know the case better than I do. What findings did he make that led to his conclusion it was a 50-50 split on disassociation? I'm looking at page 2 of the memorandum in order, Your Honor, and I think it just goes back to the sweat equity that I've been discussing, the sweat equity contributed and the business plan which the entity utilized after the fact and testimony was given that the business plan was sound and that they thought the venture could be profitable going forward using that business plan. Well, in paragraph 5 on page 2, he draws this conclusion, Plaintiff and Peretz each hold a 50 percent interest in Hastie. Right. What is that based on? Well, I concur by simply reading the memorandum in order. It doesn't go into specific detail. I can't. Okay. Now tell me what you think it's based on. Okay. All right. I think it's based on the significant evidence before the court at the trial court that Peretz's group was the money and Lincoln Provision identified the opportunity, had all the experience, invested months and months of their efforts bringing this opportunity from a concept to something that could be put into effect, presuming that the real estate could be purchased and assets purchased in the bankruptcy court. The business plan was sound. The testimony of Peretz is that he was utilizing that same business plan or was going to moving forward and given their lack of knowledge in the industry, all of what our clients had put forth in terms of the overall plan and potential relationships with customers, placing of the product, and all the things that actually make this a profitable business was done by our clients. So the opportunity was in a package, and the fact is these folks just couldn't get to an operating agreement. So it was a business that was ready to go, but for the fact that they couldn't come together on the operating agreement. And so I think the court looked at the agreement of the parties to do the capital infusions at 70-30 as an understanding between the parties that essentially 20% from the 30 to 50 on a 50-50 was that kind of the sweat equity, the putting together the plan and the opportunity. That's my understanding. I understand the court's point that it's not specifically laid out in the order, but that's my understanding on how it came to be, Your Honor. Okay. Now explain this, the argument that Mr. Betterman makes, which is essentially his fairness argument, which is that your client put in $100,000 and gets back $880,000, gets his $100,000 back plus $780,000. What's your response to that? Well, my response to that is the value, the appraisal value a year before the trial was $12.5 million. We had asked the trial, and evidence was put on by our clients that the true value was $18 million. No contrary evidence was put on by the appellant. And so we looked long and hard at this in all frankness of, my gosh, $880,000 for a valuation of $18 to $12 million. But we found that the court had analyzed the facts correctly. The standard of review was clear error, and to our dismay, we didn't find clear error. Otherwise, we would have been appealing or cross-appealing on the valuation. So it's true that the $100,000 was put in, but what was the value of that? I mean, the real estate itself was purchased for $3.9 million, and that was a transaction that was closed two days prior to our disassociation. So that was value of the business. When did that $18 million value figure come from? That was testimony of, I believe, three of our witnesses, Mr. Stevens and then two other individuals. And that value consisted of what? An ongoing operation? Yes. Well, it consisted of the valuation of the real estate, which was put at $12.5 million a year prior alone, just the real estate. And there was no evidence that the real estate or the valuation had dropped in the intervening year. And as the court may recall, this was from 2009 to 2010. So an 2009 valuation, given other market factors, we believe the evidence showed was quite reasonable. So with that, we believe this is a fact-intensive case, and there's no clear error. There's been no showing of clear error. So the non-monetary contribution on your client's part consisted of what? Well, it consisted of identifying the opportunity, including identifying the real estate that could be purchased at significantly below market value from the bankruptcy court. And it was, in fact, purchased at 3.9. The only appraisal evidence is 12.5. So bringing that opportunity to the table arguably could be an $8.5 million benefit, presumably. That was step one. And then step two was putting together a very complicated business plan of how to run and operate this facility, which would be dedicated at least somewhat to kosher cuts and marketing, which is a different industry of which our clients had substantial history in. They had been in the meat business for decades, the Stevens family, that is. And the Puritz group was more looking to be investors and the backers. I'm not sure how relevant it is, but in the values, the district court, the magistrate just didn't buy your argument about valuation. But were the valuations based on an ongoing business, such as that your client was managing it, that your client was supposed to come up with the, I think it was cattle, wasn't it? Was it cattle or hogs? Cattle. Yes, Your Honor. Cattle. But your client never managed and never produced the cattle. Would that affect the ongoing value of the company if you didn't have your client's management? I mean, was that discussed when they were evaluating the business? If he's out, you don't have anybody to manage it? You don't have any cattle to slaughter that are readily available anyway? No. Well, first of all, Puritz testified that he believed, based on the business plan and what was involved with that, that he could take that and go forward and run a profitable business. And the business did not dissolve as a result of our clients choosing to disassociate. So I would say no, because our clients were ready, willing, and able to place the cattle to run the business, but for the fact that they couldn't get to an understanding, an operating agreement between the two of them, which we contend, well, I'm sure each party contends it's because the other party was being difficult. But we were ready, willing, and able to put this in motion, and that same plan was then taken and kept by Hastings and Mr. Puritz, and he testified at the trial that he believed that the plan was sound and that they intended to move forward on that basis, i.e., the company and business could be profitable based on what our clients had put together. Well, I guess you've answered the question I was going to ask you. In simpler terms, what went wrong here? Well, I get the most direct answer is it's not up and running because something that Mr. Puritz either did or failed to do, because we disassociated, and our disassociation wasn't the reason it failed. In fact, Mr. Puritz's own testimony at trial said they intended to and believed they could move forward without us on our plan. And the disassociation was the result of what? Well, the result that an operating agreement could not come to pass, that the parties could not agree. You're moving it back one step, and why didn't it come to pass? I'm not sure about the exact specifics. I think it was a myriad of things they just weren't able to agree on. Is it in the record what they were arguing over or couldn't agree on? I know they had the percentages down and all that, but they didn't. I mean, it's neither here nor there, but as Judge Wolman, I'm curious at what it was that they couldn't get together on. Well, I think it had to do somewhat with the management. There was some question of member managed and manager managed and who was going to have that role and who would ultimately have the power. That's fine. Okay. Go ahead. So in any event, we believe Mr. Betterman and his clients are asking the court to apply the wrong legal analysis to this and that it's a disassociation case and not a dissolution case based on the testimony of appellants themselves. Mr. Betterman didn't address it, but they had some theories in the briefing that there was a fail-safe agreement reached, that there were some discussions back and forth between the lawyers of whether or not the parties could come to some agreement regarding the operating agreement, but there was never an agreement. The lawyers talking back and forth and drafts of agreement passing back and forth did not create an agreement, and the trial judge evaluated that correctly. And since there was nothing signed and there was no agreement, you simply go back and apply that statute, which we've discussed. So again, there's no clear error in the record. There's no clear error that's brought to you by the appellants. And as such, we would request that the lower court judgment be affirmed and that cost of the appeal only including fees be assessed to the appellant. Thank you, Mr. Jordan. Thank you. Thank you. Mr. Betterman, you have three and a quarter minutes. I beg your pardon, Judge? You have 3.23. Oh, thank you, Judge. With all due respect to counsel, counsel said there was an appraisal in the record for $12.5 million. You will look very hard and find no appraisal in the record for $12.5 million. You will find the declaration of the appraiser, and he said that that 09 appraiser was wholly unreliable. He said there were national trends of a downturn in the market in 09 that he didn't find. There were changing conditions of the equipment. Trial court correctly found that that was nonsense, and it is nonsense. It is very disingenuous to suggest that there's a 12.5 value on this property because there is none. I would also point out to the court that with respect to this idea that you don't use the dissolution provision to measure the value of a distribution right, I would query then, we're now on the default provisions of the Act, what provision of the Act does Lincoln suggest we should look to to determine what the extent and nature of a distribution right is in this LLC? There is no practical other alternative than to use the measure provided in the dissolution provisions, and that makes sense because you'll note that under 35-65C, if the agreement's not consummated, the disgruntled associated member gets to go to dissolution, and as if there were no sale order. That's an important provision. What it suggests to me rather clearly is that the measure by statute is that which is carefully provided for in 35-10B. I also look at Lieberman. Now, I've got to admit, I'm citing a dissenting opinion, but I looked in vain, and I couldn't find any guidance on this. But that judge, Wyoming, you know, was the first state that had it, and if you look at his dissenting opinion, he pretty well predicted the way the law would go by changes in the statute. I'm talking about Judge Lehman. But he found that the use of the dissolution provisions made sense because that's a legislative termination properly to determine the value of the equity. And why should the departing partner get anything different than he would get in a dissolution if only one guy's leaving? Why shouldn't he get the same amount that he would have gotten if everybody left? There's no why. The other thing is, is the Uniform Partnership Act provides for that, that you have this hypothetical liquidation, and measure the distribution based on whatever the provisions would be provided for for distribution. The fact that it's a disassociation and we're using dissolution provisions is necessary because there's no other provision in the Act we could use to measure exactly what the extent and nature of those rights are that we're going to value for the distributional rights. Bear in mind that we're not valuing the membership interest. The membership interest would include the right to manage and all that sort of thing. We're just valuing the naked right to distributions, that is, the right to money over time. This failsafe agreement did exist. On June 21st, they met and they had the agreement. It's memorialized in the last paragraph of E-58. Everybody agreed to it and the trial court simply ignored the evidence. I can't understand it. And that failsafe agreement was that if one guy went forward and the other guy didn't go, the guy that didn't go would get cashed out for what he had in the deal. It was real simple. And you could see in the email trail that that was what Lincoln was suggesting all the way. Look at Exhibits 235, 81, 83. No question that this was the deal. And yet we relied on that deal. We went forward. We put up the $3.9 million, $3.8 of ours in reliance on the fact that I'm out of time. Thank you very much, Your Honor. Thank you, Mr. Betterman. Okay, we will take it under advisement and be back to you in due course. Thank you very much.